IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>        Plaintiff,<br><br>    vs.<br><br>LUIS AGUILAR,<br><br>        Defendant. | Case No. 8:07CR232<br><br>REPORT AND RECOMMENDATION |

This case came before the court on the defendant's Motion to Suppress (#11). Hearing was held on September 13, 2007. Robert Sigler, Assistant United States Attorney, represented the government and David Stickman, Federal Public Defender, represented the defendant. The Transcript of the hearing (#19) was filed on September 24, 2007 and the matter was deemed submitted.

Luis Aguilar moves the court for an order suppressing all evidence and statements derived from a warrantless search and seizure of his person and belongings on April 12, 2007. Specifically, Aguilar alleges that he was stopped, detained, and searched in a manner amounting to an arrest and in violation of his rights under the Fourth Amendment to the United States Constitution. Aguilar also alleges that subsequent to his seizure and search, he was questioned in the absence of a valid waiver of his rights under *Miranda v. Arizona*, 384 U.S. 436 (1966). The government's position is that the encounter between law enforcement and Aguilar on April 12, 2007 was a consensual encounter that ultimately led to the Aguilar's voluntary consent to search his luggage.

## FACTUAL BACKGROUND

Alan Eberle testified that he is a 10-year employee of the Nebraska State Patrol currently assigned to the commercial interdiction unit as an investigator. He described the mission of the unit as watching for individuals using commercial means of transportation as drug or currency couriers (5:20-22). He described an average year of work as involving 50-60 cases, of which 25-30 occur at the Omaha Greyhound bus terminal (6:10-20).

On April 12, 2007 at approximately 6:00 a.m. Eberle, along with other officers of the interdiction unit, observed a Burlington Trailways bus, originating in California and destined for the east coast, pull into the Omaha depot overhang just south of the terminal. This Trailways bus, which is scheduled to arrive daily between 5:05 a.m. and 5:25 a.m. stops in Omaha for approximately one-half hour, during which time passengers are required to exit the bus while baggage handlers remove luggage required to go on other buses or to add the luggage of new passengers waiting to board (7:15-25).

Eberle testified that as he observed passengers departing the bus, an individual later identified as Luis Aguilar caught his eye. Aguilar was among the first 10 passengers to actually get off the bus and he appeared in a hurry as he walked towards the front of the bus and around to the driver's side (9:2-8). Eberle observed Aguilar walking back and forth near the luggage bay doors even though the doors remained closed at that time. As Aguilar walked towards the third luggage bin on the driver's side of the bus, he looked around as if to see if anyone was watching. Aguilar then walked around to the passenger side of the bus and approached the third luggage bin where a baggage handler was working. Aguilar then stepped in front of other waiting passengers, reached into the luggage bin and started moving suitcases, before grabbing a newer blue suitcase and

pulling it off the bus (11:11-20). As Aguilar removed the suitcase from the bus, Eberle was able to see that the bag had a handwritten baggage claim tag affixed to it which included handwritten information that passengers generally fill out and place on their luggage (13:19-23). Eberle observed the tag contained minimal information–only a name and the city the bag was going to–no street address, phone number, city, or state. This concerned Eberle because, in his opinion, there was no purpose in even filling out the card because if it was used to contact the owner there was no information as to location other than Sioux City (14:3-12).

Eberle testified that after Aguilar removed the bag he walked towards the north end of the terminal along the passenger side of the bus (14:15-21). Eberle then approached Aguilar stating, "Excuse me, sir." Aguilar stopped and looked at Eberle. Eberle informed Aguilar that he was a police officer with the state patrol, and he displayed his badge. Eberle explained to Aguilar that there was no problem, that he was not under arrest or in any kind of trouble. Aguilar interrupted, stating that he spoke very little English (15:10-19).[1] In Spanish, Eberle then identified himself as a law enforcement officer and explained to Aguilar that there was no problem, that he was not under arrest. Eberle asked Aguilar in Spanish if he could view his bus ticket. Aguilar replied, "Sí" and "yes" (16:19-17:21). Aguilar produced his ticket and Eberle examined it. Eberle noticed the ticket was purchased within 12 hours of travel for cash and was a one-way ticket from San Jose, California to Sioux City, Iowa (18:2-7). Eberle asked Aguilar in both Spanish and English if he had any identification or ID. Aguilar reached into his pocket and pulled out his wallet

---

[1]Investigator Eberle testified that he is not fluent in Spanish, but does speak enough Spanish to ask questions of bus passengers which require yes or no answers (15:25-16:7).

and handed the entire wallet to Eberle (19:10-13). Eberle asked Aguilar both in Spanish and English if he could search his wallet for identification. Aguilar replied, "Sí" and "yes" (19:15-19). Eberle examined the wallet and found no U.S. form of ID similar to a driver's license, but he did find an icon card for Jesus Malverde, who Eberle believed to be "patron saint" of drug couriers (19:24-20:12). Eberle noted that while investigating cases over his five years with the interdiction unit and his last 10 years with the state patrol, he had never had an individual in possession of such a card who was not either involved in an ongoing case or carrying contraband (20:11-18).

Eberle testified that while he was attempting to converse with Aguilar, another individual who was a passenger on the bus came forward, identified himself as Carlos Juarez, and asked if he could help by serving as an interpreter. Eberle then spoke with Aguilar using Juarez as an interpreter (22:11-13). However, as Juarez began interpreting, Eberle became suspicious because when he asked Juarez to ask Aguilar where Aguilar was coming from, Juarez answered the question before asking Aguilar the question in Spanish, so Eberle reminded Juarez that he had to ask the question to Aguilar (23:4-11).

Eberle testified that after Juarez arrived he noticed Aguilar, who was previously nervous, was getting more nervous, and his nervousness was actually escalating (25:23-26:2). Eberle noted that as he asked a question in English, Juarez would say something to Aguilar in Spanish, Aguilar would respond in Spanish, and Juarez would convey the answer to Eberle in English (27:16-28:3). Eberle then asked Aguilar both in Spanish and in English if he could search Aguilar's property. Juarez also asked Aguilar in Spanish if Eberle could search his property. Aguilar responded, "Sí" and "yes" and laid his suitcase on its side and began to unzip the suitcase (28:12-29:8). Eberle asked Aguilar

both in Spanish and in English if for officer safety, he could search the suitcase rather than have Aguilar reach inside the suitcase. Aguilar then slid the suitcase towards Eberle's feet (29:19-30:14). Eberle knelt over the suitcase and conducted a search, locating two large shampoo bottles that were much larger than those used by a normal traveler. Upon squeezing the bottles Eberle felt a hard item in the middle of each bottle. Based upon the concerns over the shampoo bottles, Eberle took the bottles into his possession and asked Aguilar both in Spanish and English if he could bring his suitcase back into the back luggage room for an additional search. Aguilar did not respond verbally, but grabbed his suitcase and followed Eberle into the back luggage room (32:7-25). In the back luggage room, the two bottles were cut open and were found to contain methamphetamine.

Eberle testified that Aguilar was then placed under arrest and read his *Miranda* warnings in Spanish by Trooper Coover, after which Aguilar stated that he did not wish to be interviewed (40:2-14).[2]

Eberle testified that from the time he first approached Aguilar to the time he cut open the first bottle in the baggage room was approximately 10-12 minutes and when the methamphetamine was located, Aguilar's bus had not departed (40:15-25).

---

[2] During oral argument, counsel for the United States noted that the defendant did invoke his *Miranda* rights; however, there was some indication in the report of Investigator Coover that at the time he did so, the defendant made a statement, in Spanish, to the effect that he was responsible for what was in the bag. Counsel acknowledged that this would not be a statement that followed a knowing and intelligent waiver of the defendant's *Miranda* rights. If the case goes to trial, there would probably have to be a hearing by the trial judge on whether it was a voluntary statement. *See Jackson v. Denno*, 378 U.S. 368 (1964). (69:17-25).

On cross-examination Eberle admitted that at the time he contacted Aguilar he had neither an arrest nor search warrant (43:10-14), and he also admitted that he is not certified in Spanish (46:9-11).

On cross-examination Eberle stated that he thought Aguilar understood bits and pieces of what he was saying in English, but was having difficulty understanding (53:20-24). Eberle admitted that he did not understand all that Juarez said to Aguilar in Spanish (54:22-55:5).

## LEGAL ANALYSIS

Luis Aguilar's bag captured the attention of trained Nebraska State Patrol investigator Alan Eberle due to Aguilar's actions at the Greyhound bus depot. Aguilar's bag appeared to have insufficient identification or writing. Eberle was able to determine that Aguilar paid cash for his ticket and purchased a one-way ticket within 12 hours of the bus' departure from San Jose, California. This combination of factors suggested to Eberle that Aguilar might be implicated in drug trafficking.

Encounters between the police and citizens fall into three general categories: (1) consensual or voluntary encounters, which are not seizures and do not implicate the Fourth Amendment, *see, e.g., Florida v. Bostick*, 501 U.S. 429 (1991); *Florida v. Royer*, 460 U.S. 491 (1983); (2) investigative detentions, which are seizures of limited scope and duration within the meaning of the Fourth Amendment and must be supported by a reasonable articulable suspicion of criminal activity, *see, e.g., Terry v. Ohio*, 392 U.S.1 (1968); *Reid v. Georgia*, 448 U.S. 438 (1980); *United States v. Sokolow*, 490 U.S. 1 (1989); and (3) physical arrests, which must be supported by probable cause. *See generally*

*United States v. Johnson*, 326 F.3d 1018, 1021 (8th Cir.), *cert. denied*, 540 U.S. 962 (2003).

 I find that Investigator Eberle's initial contact and conversation with Aguilar were consensual. Eberle informed Aguilar he was a police officer and that he was not in any kind of trouble or under arrest. Eberle was dressed in plain clothes and, although he carried a gun, it was not in open view. While other officers dressed in plain clothes were in the general area, none made their presence known to the defendant. Aguilar responded to Eberle's request made both in Spanish and English and all of his responses and actions were appropriate given the context of the questions. Aguilar responded yes and "Sí" to Eberle's request for permission to search his person and luggage. Following the initial search of the bag, he accompanied Eberle to a back storage room where the final search occurred. I note that while Aguilar argues that the involvement of Juarez as an interpreter clouds the issue, a review of the record shows that Eberle asked all key issue questions of Aguilar both in English and Spanish, and Aguilar answered each of those questions in the affirmative in Spanish and English. I find Eberle's testimony to be credible and I find Aguilar voluntarily consented to the search of his bag.

## RECOMMENDATION

 **IT IS RECOMMENDED** that defendant's MOTION TO SUPPRESS [#11] be denied.

 Pursuant to NECrimR 57.3, a party may object to this Report and Recommendation by filing a "Statement of Objection to Magistrate Judge's Recommendation" within ten (10) calendar days after being served with the recommendation. The statement of objection shall specify those portions of the recommendation to which the party objects and the basis of the objection. The objecting party shall file contemporaneously with the statement of

objection a brief setting forth the party's arguments that the magistrate judge's recommendation should be reviewed *de novo* and a different disposition made.

**DATED October 23, 2007.**

**BY THE COURT:**

**s/ F.A. Gossett**
**United States Magistrate Judge**